# Ex. C

# (Excerpts from Hearing on Motion to Dismiss)

1            UNITED STATES DISTRICT COURT

             EASTERN DISTRICT OF PENNSYLVANIA

2

APOTEX, INC.,            )

3                        )

          Plaintiff,    )  2:06-cv-02768-MSG

4                        )

          vs.     )  Philadelphia, PA

5                  )  October 22, 2009

CEPHALON, INC., ET AL.,     )

6                  )

          Defendants.    )

7

8        TRANSCRIPT OF ORAL ARGUMENT ON MOTION TO DISMISS

         BEFORE THE HONORABLE MITCHELL S. GOLDBERG

9            UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:     BRIAN SODIKOFF, ESQ.

                   KATTEN MUCHIN ROSENMAN

12                 525 West Monroe Street

                   Chicago, IL 60601

13

                   HOWARD LANGER, ESQ.

14                 LANGER GROGAN & DIVER

                   1717 Arch Street

15                 Philadelphia, PA 19103

16

     For the Defendants:     JAMES C. BURLING, ESQ.

17                 WILMER CUTLER PICKERING HALE & DORR

                   60 State Street

18                 Boston, MA 02109

19                 JAY LEFKOWITZ, ESQ.

                   KIRKLAND & ELLIS

20                 601 Lexington Avenue

                   New York, New York 10022

21

22   ESR OPERATOR:        STEPHEN SONNIE

23

24

25   Proceedings recorded by electronic sound recording.

1        MR. SODIKOFF:  Yes, sir.

2        THE COURT:  Okay.  I'm listening.

3        MR. SODIKOFF:  Apotex is a generic manufacturer of

4   drugs and it has invested substantial assets to develop a

5   generic version of modafinil.  The investment that Apotex has

6   made so far has included formulating a tablet, conducting

7   extensive stability and bioequivalence testing, drafting and

8   submitting proposals and ANDA to the FDA to obtain approval.

9   And through Apotex's efforts, it has been able to obtain

10  tentative approval from the FDA to market modafinil.  So

11  the -- Apotex has met all the scientific requirements to get

12  its modafinil on the market.  However, Apotex is not on the

13  market and cannot get on the market because of the actions

14  taken first by Cephalon and then joined by the generic

15  defendants.

16       Before the break, this Court asked, "What does Apotex

17  seek here?"  Apotex has claims that I divide into two main

18  categories.  The first would be declaratory judgment patent

19  claims, and the second would be our antitrust/ --

20       THE COURT:  Well, I know what your claims are.  My

21  question was what's your advice to me as to how I proceed on

22  those two separate companies?

23       MR. SODIKOFF:  Your Honor, we've --

24       THE COURT:  Aside from you want me to deny their

25  motion to dismiss.

1      MR. SODIKOFF:  Right.  The 516 patent the defendants

2  have admitted, we have jurisdiction over.  The 346 patent I'll

3  go into.  I think it's pretty clear we have jurisdiction under

4  Caraco.  We would like to have those separated from the rest

5  of the claims in this action and move forward expeditiously.

6  We're, I think, scheduled to receive the documents from the

7  defendants tomorrow pursuant to this court's order.  We'd be

8  ready for summary judgment in six months and a trial within a

9  year.

10      We think that everything that you've heard here today

11  really imbues Apotex's purpose here of entering the market

12  with a generic modafinil product and we'd like the opportunity

13  to get there.  And if we're allowed to move forward with our

14  declaratory judgment claims on the 516 and 346 we can finally

15  break the bottleneck that the Cephalon and generic defendants

16  have created.

17      I believe we've moved for bifurcation or I think

18  under -- I can't recall the rule right now, another type of

19  separation, I think that's pending before the Court; it might

20  actually have been dismissed leading up to this, but we could

21  re-brief the Court or rely on the pleadings thereof.

22      THE COURT:  I think -- and I'm just guessing, but I

23  think it was dismissed when I first got reassigned the case to

24  without prejudice.

25      MR. SODIKOFF:  Correct.

1      THE COURT:  And if you want to -- have you re-filed

2  that motion?  I mean if you want to press that, if you want to

3  press it here, re-file it.

4      MR. SODIKOFF:  Okay.  Thank you, Your Honor.

5      I'd like to turn --

6      THE COURT:  Before you get to your argument on motion

7  to dismiss, very briefly from Mr. Burling and Mr. Lefkowitz,

8  what's your reaction to Apotex's request that we give them a

9  separate scheduling order on the patent claims, six-month

10  discovery period and trial in a year?

11      MR. BURLING:  Well, Your Honor, I think for a number

12  of reasons there's --

13      THE COURT:  Assuming I deny your motion.

14      MR. BURLING:  There's some great difficulty in having

15  cases go forward separately and let me explain why.

16      THE COURT:  Okay.

17      MR. BURLING:  The overlaps are really -- again,

18  depending on how you handle the motion to dismiss it makes

19  severance difficult.

20      First of all, many of the plaintiff's antitrust

21  theories and claims that you've heard, we'll, we don't think

22  they're credible claims.  If they were to go forward, Your

23  Honor, were to describe, for example, that the underlying

24  patent merits needed to be examined as part of the antitrust

25  case, having them examined once in the context of the Apotex

1    516 claims and then a second time separately in the context of

2    the antitrust case, particularly if discovery on one started

3    before the other, you'd have completely duplicative discovery,

4    redundant depositions, you know, there's every reason to put

5    all of the merits of discovery on the 516 together if there is

6    going to merits of discovery.  Obviously, if Your Honor

7    dismisses all the antitrust claims, that's a different

8    situation.  But you have --

9        THE COURT:  But you and Mr. Lefkowitz, I think, have

10   said, "Well, there really is no bottleneck.  Apotex can just

11   prosecute their patent claim."  So are you suggesting that I

12   prioritize my decisions of, well, there's going to be some

13   duplication, Judge, so delay the prosecution of the patent

14   claim because there's going to be duplication over there,

15   right, which you recognize and really takes care of the

16   bottleneck to prosecute their patent claim?

17       MR. BURLING:  Well, I'm not arguing for delay for the

18   sake of delay, if you would, Your Honor.  This is going to be

19   an enormous -- if it goes forward, an enormously burdensome

20   and expensive case with lots of discovery.

21       THE COURT:  But you guys keep saying it's -- you say

22   "There's no bottleneck problem, Judge.  Let them prosecute

23   their case."  But now you're saying it's going to be

24   burdensome and expensive.

25       MR. BURLING:  No.  The --

1      THE COURT:  Of course it's going to be burdensome and

2   expensive.

3      MR. BURLING:  I think they should prosecute their

4   case.  But what I was about to say is that separating it so

5   that all the discovery has to be done once in the patent case

6   and then potentially at a later time in the antitrust case

7   adds -- increases that burden.  Beyond that, and therefore

8   we're not arguing for delay, we're arguing simply that when

9   the case goes forward we do the 516 merits discovery if there

10   is such a discovery that pertains to the antitrust case also

11   at the same time.  So the inventor deposition, we have all the

12   parties who want to depose the inventor in the room who ask

13   their questions at the same time.  We don't have to call each

14   witness back twice; once for a deposition in the antitrust

15   case, a second time for a deposition in the patent case.

16      THE COURT:  There's got to be a way to do it.  I mean

17   I realize this is an incredibly complicated case but there's

18   got to be a way for what you and Mr. Lefkowitz say that is let

19   them prosecute their case and get rid of the bottleneck.

20   There's got to be a way to envision their day in court without

21   getting caught up.

22      MR. SODIKOFF:  Your Honor, I -- just to weigh in,

23   Apotex does not expect to take significant discovery on the

24   patent claims because we're getting all the discovery already.

25   So, I mean, deps of inventors we maybe want a half day just if

1    we have any follow-up questions.  I don't think there's going

2    to be a lot of other depositions that we even want.  So to

3    take the step now to delay this --

4        THE COURT:  Well, I'll look for your motion.

5        MR. SODIKOFF:  Thank you, Your Honor.

6        THE COURT:  And I kept interrupting Mr. Burling, I'll

7    let you finish and then Mr. Lefkowitz can chime in if he

8    wants.

9        MR. BURLING:  Yes, the last thing I said, we will

10   respond in detail in opposition to the motion.  But another

11   difficulty, I don't quite know how to come at this is the

12   declaratory judgment counts on the 516 patent include, for

13   example, a patent misuse count.

14       Now, separating a patent misuse count from a patent

15   infringement count, I think, not only is inefficient, I'm not

16   sure that really complies with the claim splitting principles

17   or whatever.

18       The patent misuse count, as I explained, I think,

19   yesterday morning, the definition of misuse is going beyond

20   the bounds of the patent and excluding, that's exactly what we

21   would be examining in any antitrust claim that went forward.

22   The misuse claim in substance is really more of a competition

23   claim, same as an antitrust claim even though in the end it

24   pertains to the enforcement of the patent.  So -- unless they

25   waive their misuse plan, I don't know, but there is an overlap

1    there that's very difficult to escape in a motion.

2         THE COURT:  Sure.  I'm sure it is.

3         MR. SODIKOFF:  I would like to --

4         THE COURT:  Mr. Lefkowitz, you want to be heard?

5         MR. LEFKOWITZ:  Yes, Your Honor, we certainly would

6    be very comfortable having the patent case proceed as

7    expeditiously if the Court is able to hear it.  And we would,

8    obviously, second I think everybody's view that we should try

9    to avoid duplicative discovery.

10        THE COURT:  Of course.

11        MR. LEFKOWITZ:  But we're very comfortable there.

12        THE COURT:  Okay.  Great.

13        MR. LANGER:  It's Howard Langer for Apotex.  I think

14   the one thing that --

15        THE COURT:  How do you spell your last name, please?

16        MR. LANGER:  L-A-N-G-E-R.

17        THE COURT:  Go ahead.

18        MR. LANGER:  I think that what's clear from Your

19   Honor's question and what's clear from everything you've heard

20   the last two days is that if the patent case were put on

21   anything near the track of the antitrust case we would be

22   spinning wheels in the patent case.  It would be of very

23   limited value to Apotex which filed it several years ago and

24   has been trying to come to market for several years.  So that

25   the need to sever it and move it quickly is really a function

1     of whether the case is going to provide any use plus --

2     THE COURT:  Well, I'm -- I think I'm going to be very

3     receptive to that and very receptive to the argument in light

4     of Cephalon and the generics continued argument that the

5     bottleneck is not an issue here.  You can prosecute your

6     patent case.  Well, let's take them up on it and let's get the

7     patent case moving.  I'm not making that decision now.  I'm

8     saying we have to consider their response and I realize now

9     I'm backing myself into a corner.  Giving myself more work

10    immediately but I just think the defense and if we insist on

11    their position and I think they -- I'm not saying they're

12    being inconsistent, particularly Mr. Lefkowitz's response, but

13    I'll take a look at what you want to file.  Okay.  So go

14    ahead.

15    MR. SODIKOFF:  Thank you, Your Honor.

16    I'd first like to go into our antitrust claims and

17    then kind of sweep up the declaratory judgment claims at the

18    end.  I won't speak to the tortious interference claims

19    because I think we're comfortable with resting on our briefs

20    on that as well.

21    THE COURT:  Very well.

22    MR. SODIKOFF:  And when I'm complete, Mr. Langer has

23    a short section also.

24    THE COURT:  Okay.

25    MR. SODIKOFF:  Throughout the last two days, the

1    defendants have told this Court that there is no circuit

2    split, but they haven't really gone through what the

3    implications of that argument are and what that necessarily

4    means.  And what it means is that each of the cases that have

5    been decided before this one, Tamoxifen, Cipro, Cardizem,

6    Valley Drug and the rest, were decided on their particular

7    facts.  And that the particular facts in each of those cases

8    what was ultimately determinative and that is very critical

9    for where we are right now in a 12(b)(6) in that we haven't

10   developed all the facts.  So if there is one case law and

11   different circuits are coming out with different decisions,

12   necessarily it's the facts that are different and we need to

13   develop the facts here to see which one we're closest to.

14        I think it also means necessarily that the scope of

15   the patent is not outcome determinative.  It is but one factor

16   to weigh in the balance between the actual adverse affect on

17   competition and the pro-competitive redeeming virtues of the

18   agreements.

19        THE COURT:  Could you go back, you said the scope of

20   the patent is what?

21        MR. SODIKOFF:  It cannot be outcome determinative.

22   That is, it's not just scope of the patent, I apply that legal

23   rule and I throw the case out.

24        THE COURT:  Well, why can't I -- why can't I just

25   look at the scope, examine the patent -- look at the scope of

1    the patent and examine the agreements with the generics?  Why

2    can't I do that?

3         MR. SODIKOFF:  I'll go into it in a second and show

4    later that there's a lot of factual issues that are involved

5    there.

6         THE COURT:  Okay.

7         MR. SODIKOFF:  Secondly, that would not be consistent

8    with In re Cardizem because while In re Cardizem was an

9    interim agreement, there is no question that it was within the

10   scope of the patent.  A great part of it was keeping a generic

11   off the market which is within the scope of the patent and

12   still the Sixth Circuit held that it was an illegal

13   arrangement and in fact, per se, illegal.  So you can have

14   something occur within the scope of the patent and I'd also

15   like to cite the U.S. v. Singer case.  There, the plaintiff,

16   and this is a Supreme Court case that's briefed in our

17   opposition, the plaintiff had a valid issued patent and

18   decided to pursue it against only Japanese manufacturers.

19   There was no claim that the actual infringement suit was a

20   fraud or a sham.  Yet, the Supreme Court still held that

21   pursuing these Japanese competitors was illegal under the

22   antitrust laws.  That is, the actual litigation was within the

23   scope of the patent yet it was still an antitrust violation

24   and the Supreme Court looked at the intent and scope and the

25   purpose of the parties in what they did.  And there they

1    colluded in an interference proceeding to get a patent but

2    there's no allegation that the patent wouldn't have issued

3    anyway.  And here you have the generic defendants in Cephalon

4    colluding to abuse the Hatch-Waxman Act to create these

5    bottlenecks and also to enforce them against certain

6    competitors like Apotex.  The net result here is that Cephalon

7    and the generic defendants are sharing monopoly prices and

8    have come together to enforce the patent against all other

9    comers.  And I'll get into a little more about the bottleneck

10   later.

11         So the key thing in Cardizem was that there was no

12   final settlement and that when the Court looked at that and

13   they were weighing the pro-competitive versus the

14   anticompetitive, they took off that pro-competitive

15   justification and the balances swayed.  And that's what you

16   have to do in every court, Your Honor -- in every case.

17         THE COURT:  This is a Sixth Circuit case?

18         MR. SODIKOFF:  That's a Sixth Circuit case.

19         And what we suggest is that even the Second Circuit

20   and the Fed Circuit, which is applying Second Circuit law in

21   Cipro, applies the rule of reason test.

22         And I'd like to read just one quick statement.  This

23   is from the In re Cipro case reviewing a district court

24   opinion.  And it says at 544 F.3d 1332, "Under the law of the

25   Second Circuit, the rule of reason analysis is a three-step

1    process.  First, the plaintiff bears the initial burden of

2    showing that the challenged action has had an actual adverse

3    effect on competition as a whole in the relevant market. Then,

4    if the plaintiff succeeds, the burden shifts to the defendant

5    to establish the pro-competitive redeeming virtues of the

6    action."  And then finally, "Should the defendant carry this

7    burden" and this is one of Apotex's arguments, "the plaintiff

8    must then show that the same pro-competitive effect could be

9    achieved through an alternative means that is less restrictive

10   on competition."  And I think we'll get to this in the

11   bottleneck that the Cephalon and the generic defendants

12   certainly could have settled in a way that was an alternative

13   means that would be less restrictive of competition.

14        So even under the Second Circuit in the Cipro case,

15   Tamoxifen and Cipro, the court -- the district court went

16   through the specific facts alleged there and found,

17   ultimately, that there was no antitrust violation.  But what

18   I'd like to do is show how the facts that are alleged by

19   Apotex are outside of what was considered by Cipro and

20   Tamoxifen, and in fact, Apotex alleges things that in dicta

21   the Cipro court and the Tamoxifen court, the two cases

22   primarily relied on by the defendants, actually said that

23   would be an antitrust violation.

24        So ultimately what Apotex is looking for is quite

25   simply an order that says the motion for -- is denied.  And

1    it's denied because there are many questions of fact that need

2    to be resolved in order to weigh in the rule of reason

3    analysis whether there are pro-competitive benefits that

4    outweigh and are the least restrictive necessary.

5           THE COURT:  Isn't that a pro-competitive benefits

6    that are what?  Say it again.

7           MR. SODIKOFF:  The rule of reason weighing analysis

8    looking at whether the pro-competitive benefits such as the

9    final settlement is --

10          THE COURT:  Right.  The facts that are -- that I have

11    to look at to come to that determination are what?  The

12    settlement agreements and the patent, right?

13          MR. SODIKOFF:  No, and additional things which I'd

14    like to go into.

15          THE COURT:  Go ahead.

16          MR. SODIKOFF:  There's three main things here that

17    Apotex alleges that show that the patent is -- that what

18    Cephalon has done here is outside the scope of the patent.

19    The first one is fraudulent procurement and sham litigation.

20    The second is that it covers noninfringing substitutes.

21          THE COURT:  Hold on for a second.

22          MR. SODIKOFF:  Sure.

23          THE COURT:  Because saying fraud and sham those

24    aren't facts; those are allegations.

25          MR. SODIKOFF:  Right.

1          THE COURT:  What are the facts?

2          MR. SODIKOFF:  The facts are, and I'm going to grab

3    my --

4          THE COURT:  Yes, go ahead.  Sure.

5          MR. SODIKOFF:  And this is just one of Apotex's

6    allegations in its complaint and this is paragraph 29.  And it

7    begins with -- and it's long and it has a lot of specific

8    facts but --

9          THE COURT:  You don't have to read it, you can

10   summarize it.  I'll read it.

11         MR. SODIKOFF:  I won't read it.  I'll summarize it.

12         Basically, Apotex looked at what the generic

13   defendants alleged in their inequitable conduct case.  The

14   specific facts that were alleged there that were not this move

15   to dismiss by Cephalon that showed inequitable conduct if

16   assumed as being true.  And Apotex put each of those specific

17   facts in its allegations here.  And next week we can probably

18   supplement instead of on the information in belief if

19   necessary we could put in -- we now have actual knowledge

20   because we'll have those documents that the defendants relied

21   on.

22         THE COURT:  Knowledge of what?

23         MR. SODIKOFF:  I'm sorry.

24         THE COURT:  Knowledge of what?

25         MR. SODIKOFF:  We'll have actual knowledge of our

1    facts here.  Right now, we've alleged them.

2         THE COURT:  Summarize the facts for me.  What are the

3    facts?

4         MR. SODIKOFF:  Sure.  The facts are that during the

5    prosecution of the patent, the attorneys for Cephalon and

6    others who are involved with the prosecution of the patent

7    committed inequitable conduct and committed fraud on the

8    patent office by doing numerous acts that are alleged in 23

9    through 39 of our complaint, they include the fact that they

10   deliberately did not tell the patent office that it was Lafon

11   (ph.), a French company, that was, in fact, the inventor of

12   modafinil as well as the particle size limitations.

13        THE COURT:  How are you going to prove that?

14        MR. SODIKOFF:  How am I going to prove that?

15        THE COURT:  Yes, sir.

16        MR. SODIKOFF:  Eventually, we'll prove that with the

17   documents from Cephalon; their correspondence with Lafon

18   showing that Lafon actually told this stuff to Cephalon and

19   these are the precise allegations made by the generic

20   defendants when they saw those exact documents.

21        We're also going to prove and -- Your Honor, at this

22   stage, these facts should be assumed as true.  They're

23   specific.

24        THE COURT:  Right.  I'm not challenging you on are

25   your facts right, I just want to know what they are.

1        MR. SODIKOFF:  Okay.

2        THE COURT:  You say fraud and sham and collusion,

3    those are conclusory statements.

4        MR. SODIKOFF:  Sure.  Let me step back a little

5    bit --

6        THE COURT:  I want you to stay on the same track.

7    You're going to present facts to show that it was a fraud and

8    a sham because you're going to be able to present evidence

9    that there was some type of misrepresentation regarding the

10    actual inventor, correct?

11        MR. SODIKOFF:  Right.

12        THE COURT:  What else?

13        MR. SODIKOFF:  What else?  They also had an on-sale

14    bar.

15        THE COURT:  A what?

16        MR. SODIKOFF:  An on-sale bar.

17        THE COURT:  What's that mean?

18        MR. SODIKOFF:  An on-sale bar is 35 U.S.C. Section

19    102(b).  It is clear and objective standard that if something

20    was on-sale in the United States more than one year prior to

21    the application, it bars getting a patent on what was on-sale.

22    And we have alleged and we'll prove that Cephalon -- that the

23    modafinil product that is claimed here was subject to the on-

24    sale bar because it was, in fact, purchased from Lafon prior

25    to the one year filing date under 35 U.S.C. 102.

1          THE COURT:  And Lafon is the French manufacturer you

2    referenced?

3          MR. SODIKOFF:  Correct.

4          THE COURT:  Okay.  And as to the other facts

5    regarding fraud and sham you said paragraphs 29 through 32 of

6    your complaint?

7          MR. SODIKOFF:  Twenty-three through thirty-seven,

8    Your Honor.  I'm sorry.  I think I said 23 to 39 but it's 23

9    to 37.

10         THE COURT:  That's fine.  Okay.

11         MR. SODIKOFF:  They name specific people, facts,

12   dates, specific statements made by each person.  I can get the

13   complaint and go through each.

14         THE COURT:  You don't have to do that because we're

15   going to read them

16         MR. SODIKOFF:  Right.  And the facts that we allege

17   in our complaint which must be assumed is true, are more than

18   what the federal circuit has found to be sufficient to allege

19   fraud and to actually prove fraud in the case.  And the

20   looming case there is Noblepharma.  It's a Fed Circuit, I

21   believe -- I can't recall the year; maybe 2003.  It's in our

22   brief.

23         THE COURT:  It's in your brief, right?

24         MR. SODIKOFF:  It's --

25         THE COURT:  Don't worry about the cite.

1      MR. SODIKOFF:  Sure.

2      THE COURT:  If it's in your brief it's fine.

3      MR. SODIKOFF:  It's in our brief.  And the

4    Noblepharma case, what happened there was the inventor gave

5    something to his patent attorney and it ended up not making it

6    before the PTO.

7           And when you go to get a patent, it's an ex parte

8    procedure when a patentee or an applicant does.  And the

9    patent office has a duty of candor because the patent office

10    is not experts like the applicant is.  They have one --

11    usually one examiner.  He can usually spend one day to examine

12    an application at most.  He's busy and he just doesn't have

13    the time.  And so there is a burden and a duty that's not

14    disputed by the defendants of candor where you have to be good

15    faith, you cannot lie, you cannot make material omissions.

16           And in the Noblepharma case, the piece of prior art

17    was given to the prosecuting attorney, it didn't make it to

18    the patent office.  The prosecuting attorney said "I never

19    have bad intent, generally.  I would have definitely given it

20    over if I thought it was important.  But I don't remember

21    specifically what happened."  And the Fed Circuit affirmed the

22    jury finding of an antitrust violation for fraud on the patent

23    office.

24           The jury was allowed to infer that this man convicted

25    inequitable conduct.  That he withheld this on purpose even

1    though there was no direct testimony of it.  And there's

2    legion federal circuit cases that say that circumstantial

3    evidence is sufficient because that's usually all that exists.

4    It's very rare to have a patent attorney say I purposely lied

5    to the patent office.

6          Apotex's complaint has these specific facts.  They

7    more than meet the Noblepharma standard.  And they establish

8    fraud on the patent office.  So what does that mean?  That

9    means that the patent has no scope.  There is no immunity.

10   There is no scope of the patent test.  Everything that they

11   had done to decrease competition is an illegal restraint of

12   trade under Walker Process, under Noblepharma.

13         They have two -- I'd like to call them arguments;

14   they're not factual at all and they mention them on the

15   opening.  As arguments, they're no way pled by Apotex.

16   They're not in our complaint.  But what they've argued is that

17   the generic defendants originally didn't file fraud so there

18   must not have been.  And that the FTC did not file an

19   allegation of fraudulent procurement.

20         First, the generic defendants did allege inequitable

21   conduct and the defendants have argued to this Court that

22   there's a huge difference, or at least intimated it, but

23   there's a big difference between inequitable conduct and fraud

24   on the patent office.  But if you review the case law, that's

25   simply not the case.  Inequitable conduct requires intent to

1    mislead the PTO.  It requires a bad intent under Federal

2    Circuit precedent and it requires materiality of what you

3    withhold -- or what you misrepresent to the PTO.

4        The difference with fraud is that instead of having

5    materiality, you have to have but for causation.  The intent

6    requirement is largely similar in most inequitable conduct

7    cases.  So the generic defendants allege that Cephalon had the

8    bad intent required.  And we adopt those exact same specific

9    facts and we will plead that -- we plead them now and I think

10   we have a reasonable basis for pleading them.  They're

11   plausible because they're taken directly from sworn pleadings

12   from the defendants in this case.

13       And so the difference is that inequitable conduct is

14   materiality.  Fraud is but for causation.  That but for their

15   lie -- their omission, lie or omission, the patent would not

16   have issued.

17       We've argued a 102(b) that they withheld a 102(b)

18   invalidating reference that Cephalon and those who prosecuted

19   the patent purposely withheld prior art that would invalidate

20   the patent.  That is but for causation.  We allege a Walker

21   Process violation.  And if nothing else, Your Honor, you can

22   dismiss their motions to dismiss because that exists and

23   they've told us the last two days that we're -- a Walker

24   Process violation exists.  There clearly is an antitrust

25   violation.